I'll give everybody a chance to settle in a little bit. All right, Attorney Shanmugam. Thank you, Judge Robinson. Canon Shanmugam of Paul Weiss for Appellant Hughes Communications India. May it please the Court. The District Court in this case erred by holding that Hughes was not entitled to be indemnified by DirecTV for the license fees imposed on it by the India Department of Telecommunications. Under the party's agreement, DirecTV broadly agreed to indemnify Hughes for any and all damages arising out of taxes or proceedings before the closing date. Most obviously, the license fees constitute indemnifiable taxes under the agreement's expansive definition of that term. The license fees qualify as several of the enumerated items in that definition, and at a minimum, they were sufficiently similar to those items to require indemnification. In particular, the license fees are substantively equivalent to franchise and excise taxes that New York imposes on telecommunications providers operating in New York. They also qualify as assessments, deficiencies, and levies under the plain meaning of those terms, which refer generally to the imposition and collection of charges due. And the license fees constitute liabilities arising out of pre-closing proceedings and were indemnifiable. Could you address the question of whether the interest and fees of the subsequent litigation can be said to arise out of a proceeding against your party when you brought it before the litigation? I'm going to be quite open. I don't have much problem with the notion that fees are like taxes and so on. But I have more problem with that second part. Judge Calabresi, that will be an issue for Judge Hellerstein on remand. Oh, no, Mr. Shanmugam. You can't do that. You can't be quite so coy as you were in your briefing saying, we don't have to deal with damages. It seems to me, since you want us to address not just the tax issue, it's not good enough for you that we say, yeah, they're taxes, so goodbye. If we said that, I think you'd agree all that would be at issue are the taxes from the years, what is it, 2001 to 2003 or something like that, right? So I don't mean to be completely coy, Judge Lange. I just mean to make the point that this will be an issue that no doubt will be litigated. Excuse me, excuse me. We have to decide whether these liabilities are the result of a proceeding brought against you. And I have no problem either with the idea that the audit, the whatever you're going to call it, when the Indian tax authorities say, hey guys, we want you to come in and document why your calculation of gross revenues is correct. That starts a proceeding. But if I understand correctly, we're not just talking about late fees and interest. The ultimate gigantic judgment that comes out of the Indian Supreme Court relates to taxes that became due, assuming these things are taxes with all due respect to your adversary, are taxes that became due after the acquisition or the independence declaration of views. Am I wrong about that? So, in part, Judge Lange. So let me address all of those points. So first of all, this has not yet been briefed below for the simple reason that the parties cross-moved for summary judgment on this question of whether there is any liability in the first place. Let me tell you how we think that the court should think about this. And again, I do think this is ultimately going to be an issue for Judge Hellerstein to resolve in terms of what the final amount is. The first point I would make is that the answer — Let me just go back and be very clear. I'm not asking you about what the final amount is. The great thing about this court is we don't have to do math. That's for the district court. Fine. But, but, we have to decide what proceeding you're talking about. Correct. And if you are talking about a proceeding that commences with an audit request for the years 2001 and 2003, and even — I'm even willing to give you that once Hughes initiates an action for judicial review of whatever the administrators decided, let's, for the sake of the argument anyway, say that's still the same proceeding. But if you then keep adhering to the same definition that DirecTV used for years and years after that and not paying the taxes for the future years, I'm having a little trouble seeing why the ultimate resolution of the question, how do you decide what adjusted gross revenues is, is the result of the proceeding, the rather modest proceeding, that was instituted with respect to those early taxes. Sure. That's what I'd like you to explain. Sure. As a substantive matter, not as a matter of what the dollars add up to. Got it. So, Judge Lynch, I would say a couple of things. First of all, that the answer to all this may depend on whether or not this court determines that the relevant, triggered, excluded liability is taxes or proceedings. As we point out in our opening brief, it is important for the court to reach both of those issues. But it's important precisely because of the damages. That's why I say it being coy. Correct. Correct. As we say in our opening brief, so I think I want to be very explicit about the fact that the answer to what the ultimate math is here may depend on which or both of these two prongs is triggered. The indemnification obligation, which is at page 92 of the joint appendix, is for any and all damages arising out of, relating to, or resulting from excluded liabilities. Now, I will grant you that with regard to taxes, we would have and will have on remand perhaps a harder road to hoe in terms of making the argument that this entire amount is available because that would include not just interest and penalties on the original amount before the closing date, but potentially also tax liabilities that accrued after the closing date. With regard to proceedings, I think our argument is easier because we would conceive of this as a single proceeding that began at the point at which the India Department of Telecommunications began to examine or audit the financial information that we provided. So it is when they began to audit what you say is a proceeding, not when you brought something, and that's why you say it is against? Correct. Because there's no other requirement that this be against. We think the conceptually right way to think about this under the agreement, Judge Calabresi, is that this began at the point at which the India Department of Telecommunications examined the financial information that we provided and shortly thereafter provided the provisional license fee assessment, which was still before the closing date. At that point, there were further proceedings. There was the back and forth. The India Department of Telecommunications increased the amount. And you claim and you say that that is enough to be a proceeding, so that when a tax department sends something out to you, you say that is enough to be a proceeding. I think at a minimum at that point, you had the back and forth where we went in. We had an in-person meeting. There was a subsequent request for information. That's at JA 800. We would say that at a minimum at that point there was a proceeding. We think it probably started some period of time before that. And the reason why this is all relevant, Judge Calabresi, is simply because all of this took place before the closing date. And then our view would be that the proceeding then continued. It then proceeded into formal proceedings where once we got the final determination of the amount due, we went into administrative proceedings and then judicial proceedings. And because of that, I think, with respect to the taxes for 2001 to 2003, my question is how long does that proceeding go on and what is the consequence of that proceeding? And it seems to me it would be rather irrational to read this agreement for indemnification as not only is DirecTV agreeing to indemnify you for the taxes that you owe under DirecTV's regime, not only for any proceeding that gets started where you get sued over something that DirecTV did, but also because it's sort of a logical continuation of this dispute that you're entitled to take an extreme position, perhaps, with respect to liability and the interpretation of Indian tax law indefinitely into the future. And then, put another way, I'm having trouble distinguishing between your liability for taxes in 2024 based on the decree of the Indian Supreme Court which interprets their statute a particular way and the taxes incurred in 2018 on the same thing which gets decided by the Supreme Court because you're making the decision at that point, not DirecTV, to continue to advance a particular position, to continue to not pay the tax the way the Indian government wants it paid, and you ultimately lost that case. But that seems to me is not the same proceeding. Once they send you another notice and say, oh, yeah, by the way, for 2005, for 2006, for 2007, you owe more money than you put down on your form. It may be the same legal issue, but I don't see why that's the same. Yeah, so, Judge Lynch, let me address that directly and hopefully assuage your concern about this. So, and this does go, I think, to some extent, much beyond the interpretive issue that Judge Hellerstein addressed, and let me explain why I think that's true. Let's say you agree with us, assuming arguendo, that the proceeding began at some point before the closing. A proceeding began. A proceeding began, and that that proceeding continued all the way through the India Supreme Court's ultimate determination on this question of gross revenue. Let's just assume that for the moment. I think the question that you're raising really goes to the question of what the damages are. What are the damages that arise out of, relate to, or result from that proceeding? No, I think his question is what arises out of that proceeding. Agreed. Are there things that happen that are, as a matter of law, not out of that proceeding? That's his question. And that's the thing that I think we may have to decide rather than having it be a damage issue with Judge Hellerstein. Well, I think I agree with that, Judge Calabresi, but I would say that that is not the issue that Judge Hellerstein addressed or that we, frankly, have been addressing before this Court. And the way that I think that the analysis would operate is you would look at that language. It's very broad language arising out of, relating to, or resulting from excluded liabilities. And I do think that that has to be interpreted in light of the notice requirement. And let me get to that because I think it is related to all of this, and it's a point that DirecTV makes at great length. DirecTV makes the argument that we waited eight months to provide notice from the beginning of the proceeding, that we waited until November of 2005. But there's no dispute that at that point we provided notice, and the provisions of the agreement are quite clear if you look at JA92, that the failure to provide notice within 60 days does not waive any right to indemnification. At a minimum, DirecTV was certainly aware as of November of 2005 of this proceeding, and indeed, DirecTV should have been aware of this before the closing for the simple reason that the assessment of this amount was provided a month before the closing took place. At that point, if DirecTV wanted to say, we're going to take responsibility for this, but you have to stop taking this position, we want to cut off liability, DirecTV could have done that. Quite to the contrary, DirecTV said, yeah, we don't think we're going to provide indemnification for this, and then ultimately, DirecTV provided formal notice of that. So again, these are all issues that are well beyond the scope of what's before this Court, but we have no problem with this Court. All I'm saying is that if you think that we're going to send this back to Judge Hellerstein and just say, yep, it was a proceeding, and that's the end of the story, and then you're going to go back to Judge Hellerstein and argue the Second Circuit decided this is all the result of a proceeding. I don't think that's going to happen, and I don't think it should happen, because I think we need to understand what proceeding we are talking about and how that proceeding evolves and whether it makes any sense to say that all of the consequence of the litigation that goes on between Hughes and the Indian government, dealing with Hughes's tax liability for years long after the acquisition, I don't know what to call it, the independence of Hughes. I don't think that's fair to Judge Hellerstein. I don't think it's fair to the other side, and at a minimum, we're going to have to flag that these are very big issues for the District Court. This is not a matter of doing the math. That's what I think you should do, and I would assure you that we're not going to go back and waive an opinion that says that and say, just give us the $94 million. But I think at a minimum, if you accept the view of proceeding that we've been discussing, I think you would have to concede at a minimum that there would be liability for the financial years at issue, the tax liabilities for 2001, 2002. Subject, of course, to notice. Subject to the notice. Yes, but there's no claim. Which Judge Hellerstein did not discuss. The question as to what there should have been notice or not depends in part on what is the proceeding, doesn't it? So, Judge Calabresi, let me finish my answer on that point and then address the notice issue. On Judge Lynch's point, what I would say is that if you accept our view of proceeding, at a minimum there has to be liability for the tax amount to do for financial years 2001 to 02 and 02 to 03 and the interest and penalties for those years. Then there will be a question about whether there would be liability for subsequent years in which we took the same position on gross revenue, and I would submit that that turns on this question of how you interpret the rising out of language. On the issue of notice, Judge Calabresi, what I would say, again, is that while DIRECTV waves around this eight-month point really largely for atmospheric effect trying to suggest, well, the proceeding can't possibly have started or else you would have provided notice earlier. The critical point is that if you take a look at the notice provision, JA92, that provision on its terms says at most that any failure to provide notice within 60 days goes to the amount of damages if the indemnifying party can show prejudice. It does not waive the right to indemnification. And the critical point, and again, I think this underlies all of this, is that the provisional license fee assessment was provided on March 14, 2005 before there was a spinoff. So it's a bit rich for DIRECTV to complain about the lack of notice when at the point there was only one party. There were not two parties. DIRECTV was the parent of Hughes Communications India as it then was. And so at a minimum, DIRECTV was on constructive notice that this was all afoot before the deal in question closed. And the last thing I would say on this issue of what to do with this question of the quantum of damages is, again, I think the answer to that question does potentially depend on whether this court says there are taxes, proceedings, or both. Oh, yeah, we may have to say there's proceedings, but I think that's not the answer to the question that's before us. The answer to the question is, is the judgment the result of a proceeding that began in 2004? Are there maybe other proceedings? We may not be able to answer that question, but we need to be very clear that just to say that there is a proceeding does not dictate the outcome that the whole thing is one big proceeding leading up to a judgment at the end of it. We're very happy for you to say that because I think it's consistent with the judicial role here. We're here on our motion for partial summary judgment, defendant's motion for complete summary judgment. And so that is the part that is left for the district court. It has not been briefed in the district court. This question can't turn, I expect, on Indian procedural law, right? No, I think that this is ultimately a question of the interpretation of the indemnification obligation. Once you determine what the proceeding is, and again, I think our submission is the proceeding started before closing. It started with the evaluation of our financial information, and then it continued all the way through the Indian state. And then what arose out of that proceeding is against the rising out of potentially a subsequent proceeding. Correct, and the argument that we will make on remand, and this may yet come back to this court one day, will be that the indemnification obligation is very broad. It says any and all damages arising out of, relating to, or resulting from excluded liabilities. I'm sure my friends on the other side will take a different view, and that will be litigated in briefing before Judge Hellerstein. Thank you. Thank you. We'll hear from you again, everybody. We'll hear from your friends on the other side. Attorney Saharsky. Good morning. I'm Nicole Saharsky representing DIRECTV. This case is about communications licenses, which are a significant cost of doing business for telecommunications companies. And we're interpreting this agreement where the parties specifically addressed communications licenses and said that Hughes India is responsible for them, subject to the exclusion. Correct. And so the question isn't whether this is a communications license, or whether this is a license on communications and so on, but whether that is subject to the exclusion, which talks about taxes and similar things. Absolutely, but the point is, is that communications licenses are defined as something different from taxes in the purchase agreement. They're understood in the business community as something different from taxes. A license fee is different from a tax. This Court's Amtrak decision says that. The Supreme Court's Cable TV. How do you distinguish a license fee from a franchise tax? Yes, it's simple. First of all, it's a voluntary payment under a contract for a specific thing. It's not a mandatory payment to the government. License fees in general are not contractual. I have a driver's license. I pay a fee for it. This was a contract. You can look at it. It's a 38-page contract. It talks about the consideration that Hughes India gives, the money that it gives, and exactly what it gets in return. But how is this different from a state? DirecTV didn't have any choice about this. They didn't negotiate the terms of this. They agreed to all of these terms as the price of being given a franchise to operate in India. Isn't that right? Respectfully, I think there's a couple things about that that are not true. First of all, there was some negotiation here. They agreed to enter into the contract in 1994. It was for a period of ten years. Seven years in, the Department of Telecom went to them and said, we'd like to change the way that we calculate the license fees. We make a proposal. Will you accept it? And they said, yes, we accept that proposal, and they amended the contract seven years later. But they couldn't have done business if they didn't accept that proposal. It is as voluntary or as nonvoluntary as it was in the New York case if it's a no-fault, isn't it? Respectfully, no. There are things that you might need or want from the government to do your business, but that doesn't make them taxes. For example, the license to go through New York property in Amtrak was a license fee, not a tax. Under their view, if you rented space in a government building because you wanted it for your business, that would be a tax. But that's not. It's a contract. I don't think that follows from their view. Respectfully, I think it is because what we're doing in this or what Hughes India did in this license agreement was to give consideration. It calls it consideration and get a specific thing in return, which is access to the spectrum. It's not just a franchise tax, which is an ability to do jurisdiction in the business. It was something more specific than that. Is the spectrum a finite? In other words, is this like the air spectrum where there's like finite chunks that the government can dole out or is it more like the Internet where you can get more people? It's access to the electromagnetic spectrum, and the way that the license worked in India was that it was a non-exclusive license to maintain and operate a closed user group on a particular data network in a particular part of the spectrum. So it didn't exclude anyone. It wasn't to the exclusion of anyone else. It wasn't like we only have five of these to give. Well, I think as a general matter, it is finite, but multiple people could get licenses. We can think about how this happens in the United States, which I think is similar to how it happens in India and I think is very telling. Because in India, the only organization that was involved here was the Department of Telecom. There was no Indian taxing authority. There's an Indian Ministry of Finance. There's an Indian Department of Revenue. None of them were ever involved in this license. It was the Indian Telecom that gives you the license to be able to access the spectrum. And actually, the same thing happens in the United States, except it's the FCC that has these licenses that you get to be able to access the spectrum. They're actually in great demand. You have to auction to be able to get part of the license. And that gives you the access to the spectrum. But then there are separate taxes that you may pay to a taxing authority, like you may pay a franchise tax to New York just to be able to do business in the state of New York. That's not giving you access to the spectrum. That's just a tax you pay to do business. Or there could be an excise tax that you pay on services to the state of New York. And those are payments that if you do the thing, it is mandatory. The government makes you pay. A license is different. You decide that you want to be in the telecommunications business. You go to the Department of Telecom in India or the FCC here and say, give us a license, and then you have to go through the procedures that either the FCC or the Department of Telecom follow. Does it matter that the fee or the consideration is determined in relation to adjusted gross revenues? No, because there are all sorts of licenses that are determined that way. Intellectual property licenses, royalties, for example, are determined. But what does the term taxes or like similar things, isn't this in effect similar? And isn't the fact that they used language of that sort mean that it isn't limited to the kinds of things that you are describing as taxes? No, because this definition is all about taxes. It starts with taxes. The middle of it says taxes. And the end says taxes. And if I could just- If that were so, then why use the language of similar or like? You just say taxes, and that would cover it. Well, it lists a whole number of taxes and ways to make tax payments. And then it says or other similar charges. The word similar means you have to figure out what the things that came before have in common. The thing that they have in common is that they're all taxes or ways to book or collect taxes. And then if you weren't sure at that point, it says they have to be imposed by a government authority, mandatory, which taxes are. And then you look at the last part. This is when I said that the definition ends with taxes. And any interest, penalties, or additions to tax. That means the things we were talking about before were taxes. So the word being defined as taxes, it starts with a list of taxes, ways to pay taxes, similar charges. Then you have imposed by the government, and then additions to tax. It just taxes the whole way through. Who bears responsibility? Let's assume you're right that these aren't taxes. Who bears responsibility for the license fees, if you want to call them that, that were incurred before the deaccession abuse? So as of the closing date, the communication licenses became contributed assets. And for contributed assets, Hughes India assumed all liabilities for them. So as of the closing date, those liabilities were assumed by Hughes India. So Hughes India pays. Whatever happened before the closing date, there is a line drawn on the closing date. In other words, if DirecTV had failed to pay anything, they just blew it or decided to defy the government or something, and didn't pay the license fees for years going up to that deaccession, divestment, whatever you want to call it. Hughes assumes the liability for all of the taxes, I'm sorry, all of the license fees that didn't get paid on DirecTV's watch? Well, I think a couple of responses to that. First of all, there are representations and warranties about what happened up to the point of closing that need to be followed. But second of all, if there were outstanding liabilities of the original company that were related to contributive assets, they did get transferred to the new company. And if the new company thought that there was an issue about that, they could seek an adjustment to the purchase price. That happens commonly. It may be the case that Mr. Shanmugam was worried that we might just decide the tax issue and not the proceedings issue. But suppose we answered the proceedings issue. Would we need to address the tax issue if we decided the proceedings issue his way? If we said, well, wait a minute, you're already getting effectively sued. You're on notice in 2004 that these guys in the Indian government are coming after you and they want to audit your books as to how you calculate adjusted gross revenue. And they're asserting a certain legal position which you're going to dispute. If we were to conclude that that's a proceeding, would the issue of whether it's a proceeding about a tax become moot? I think we would urge the court to decide both. I think that there are some misconceptions that came out perhaps in some of the questioning about the proceedings that are related to whether it was or was not a tax. And I might want to address those if that's all right, which is I think this conception of a proceeding does not make sense at all. According to Hughes India, we can't even tell when it started. It's hard to tell when it ended. I mean, I think it's important. Why didn't it start when there was a notice of assessment? Here's your assessment. Because what that was was a bill under a contract. It's just like here's the amount that you owe. But why isn't even a bill under a contract if it is done by a governmental agency of proceeding? Because the definition of proceeding includes, I think, greater formality than that and requires particular processes. And I would point the court to language that it has to be commenced, brought, conducted, or heard at law or in equity before any governmental authority or arbitrator. And that it also has to be a proceeding against Hughes India. That word against is important because. What about administrative proceedings? This is not an administrative proceeding. This was a letter about the amount that was owed under a contract. And the way Hughes India treated it, I think, makes clear that no one viewed it as a proceeding at the time. They said, this is just provisional. If you guys would stop taking these amazing positions that you owe nothing or you owe $94 million out of this and went home and settled this thing, you'd be much better off than having us try to adjudicate the all or nothing here. because I think it's very difficult to accept either of the extreme positions that you guys are talking about. Can I ask a question? I know that this, we're sort of getting into the micro one. I want to tap at the proceeding. Can you step back and sort of, are there commonalities between the things that are on the assumed liability side and things that are on the excluded liability? Are there sort of conceptual distinctions? Or is it really just a matter of what got negotiated to be on which side of that line? Well, I think as a general matter, the idea is this is a new company that's going to be responsible for its own assets and liabilities. And so it broadly defines the assumed liabilities as essentially everything going forward, including taxes going forward, et cetera. And then it fairly narrowly defines the excluded liabilities. This is, of course, part of an indemnification clause, which under New York law, it is very clear should be interpreted narrowly because these are not obligations that someone has, existing legal obligations. And so that's why indemnification clauses are interpreted narrowly. And so I think it helps to look, for example, at the disclosure schedules that are part of the contract because when it comes to, I'm sorry, I was just going to say when it comes to excluded liabilities, you know, the parties needed to know what they were, right? Like DirecTV needed to know what it was agreeing to pay going forward because there was going to be this line of demarcation at the closing date. And that's why it gave examples, for example, in the disclosure schedules. And the examples that it gives of proceedings are like court proceedings, administrative adjudications. The examples it gives of taxes are taxes. It's nothing like here. But I'm going back to this sort of conception, this idea that new company gets to start with a clean slate and isn't going to be carrying baggage from the last chapter. If that's sort of the concept, don't license fees for a period of time before the new company started? And I'm not talking about everything that accrued after and all the different positions, but don't license fees for that period sort of logically fall on the excluded liability side? No, respectfully, because what it says is that if there are any liabilities that exist at the closing date, that those become assumed liabilities of the new company. And so the contract specifically contemplates... But then what is the point of saying that in the exclusions? You know, when we come right down to it, I was never a district judge, so I'm not going to suggest that you should settle. That's the sort of thing district judges talk about. Academics don't talk that way. But isn't it quite clear here that there were some things, a whole lot of things that the company was going to be liable for what happened before and what arose out of what happened before, and there were things which would come up after that were not, and that that was what the agreement was and that that is what we should try to set up for the district court to determine? Well, I think that there's a little modification I would need to make to that suggestion, which isn't that the old company was just responsible for everything that came before. It's only very specific things that come before that are in the provisions of excluded liabilities. So if you thought that this counted as a pre-closing tax or part of a pre-closing proceeding... Well, I'd like to speak to both of those if I can. With respect to taxes, you're right that it includes this other similar charges language, but there is a distinction in the law in this Court's cases, in the Supreme Court's cases, and in practice in this exact contract between license fees and taxes. They are different things, and it would have been the easiest thing in the world for the parties if they wanted to include license fees in the definition of taxes, and they didn't, and we think that that's very telling. The other thing, respectfully, that I think is telling is that no one, up until the fact that Hughes India decided to come after DirectTV, no one at the time ever acted or treated these license fees as taxes. The purchase agreement doesn't call them that. The contract, the license contract, never calls them taxes. These letters back and forth never call them taxes. In fact, Hughes India called this a breach of contract action. When they filed the administrative proceeding, they said it was a breach of contract action. The Supreme Court of India said this is a voluntary commercial contract. This is a breach of contract action. No one, no one ever called it taxes, and I just respectfully suggest that it would not make any sense to call it taxes here because the definition of taxes that Hughes India wants to use is that essentially any payment to the government would count as a tax. I think that that's a fair assessment because this is a payment under a contract. This is consideration for something very specific in return, this access to the spectrum. It's not something imposed. This is a regulatory authority, the equivalent of the FCC in the United States, saying we will give you this access to the spectrum. It's a regulatory authority. It's not like the General Services Administration is renting you space in a courthouse. This is your ability to function in the kind of business you want to function. It's a regulatory process. So whether or not that's good enough to call it a tax is one question. I understand your point about that, I think, but I don't think you can fairly say that the other side's position would entail that every time you are a government contractor and you're getting paid for something or you're paying the government for something, that those exchanges would be turned into taxes. That's not their argument at all. They're saying rather specifically this looks like a franchise tax. Now, maybe it doesn't. That's a fair point. But I don't think the argument that what they're saying opens up the universe of contractual relations with the government makes sense. Well, a couple of thoughts there. First of all, this is a contract. It looks like a contract. It has all the regular terms of a contract. It says we're giving you this money as consideration, and we get this basically ability to rent the spectrum in return. So I do think it's like renting an office in a government building. You're getting this specific thing in return. It's not like a franchise tax where it's just an ability to do business generally in the jurisdiction, and this is a negotiated contract. Remember I talked about that negotiation seven years in. It's not like a tax because a tax is something that if you do an activity, the government makes you pay it. This is something that the government agreed to and negotiated. I would also note, just to make sure that there's not any confusion on this point, there was no taxing authority involved here in India. This was all with the Department of Telecommunications. All right. I think we've got your number. Thank you very much. I appreciate your time. And, Mr. Chamberlain, we are going to hold you for two minutes here. I'll be quick. First, on the issue of taxes. Sure, it's true that there is a license agreement here, but to suggest that this was the result of negotiation is, I would submit, somewhat misleading. The Department of Telecommunications sets the rate here, and it is true that in 1999 the Indian central government established a new methodology in a document NTP-99. It's a joint appendix 554. And it is true that at that point during a transitional period, an entity like Hughes had the choice between the old methodology and the new methodology, and they chose the new methodology. But the fact remains that the rate was still a take it or leave it rate. And, of course, all that the agreement requires is that the amount be imposed by any governmental authority. It doesn't have to be the Department of Taxation. And so that's why the analogy to franchise taxes is a valid one. Ms. Saharsky says, well, you decide to be in the business. You could say exactly the same thing about the New York franchise tax. If you decide to do business in the state of New York, you're subject to the tax. That quality is the same. The franchise tax in New York is determined based on adjusted gross revenue, just as the amount here is. And so that analogy holds. And the mere fact that the agreement does not specifically mention license fees is of no moment because the point here is that there is a catch-all provision that covers all charges. That was the point of the New York Court of Appeals decision in Innofis. On the issue of proceedings, I would just make the point that the definition includes a broad range of informal as well as formal proceedings. And that's why the use of the word against should not be given the significance that Ms. Saharsky says. Judge Robinson, I think you captured the gestalt of this agreement. The gestalt of the agreement is that the seller bears ultimate responsibility for the communications licenses until the closing date and also broad responsibility for any pre-closing liabilities. Now, the labeled pre-closing excluded liabilities, but those liabilities obviously include liabilities for taxes and proceedings. Yes, there is a disclosure schedule, but that disclosure schedule includes the liabilities that Hughes would continue to bear. And so the fact that this is not included on that schedule is obviously of no significance. And then finally, on the issue of damages, the one point I would make following up on my colloquy with Judge Lynch in the opening to the argument is that it's not terribly surprising that Hughes continued to take the same position even after 2003. And that's for the simple reason that, as the Court may be aware from the materials, in 2007, the Administrative Tribunal, the wonderfully named Telecommunications Dispute Settlement and Appellate Tribunal, actually ruled in our favor on this issue. And so it's not surprising that the tax bill... Well, I wouldn't say it was surprising that you took the position. It's just a question of it's your position, right? And don't they sort of amend their pleading somewhere along the way to say, oh, by the way, based on last year, you now owe more? Yeah, well, there were various points at which the amount continued to increase. And the Department of Telecommunications steadfastly continued to take that position even after we won before the Appellate Tribunal. The India Supreme Court is not known for its speed. And after 2007, the case was proceeding in litigation before that court. And that was really the primary cause for the delay. But again, our fundamental submission is that that is an issue to be discussed on remand before Judge Hellerstein. Thank you. We will try to be faster than the India Supreme Court in getting a decision on this case. We hope so. Thank you. Appreciate it.